1760604, Ali v. Barr. We'll hear from Mr. Jenkins. Good morning. May it please the court? My name is Bradley Jenkins and I represent the petitioner Nadeem Ali. Under the government's countertextual reading of its own regulations, a person may concurrently hold asylum status and permanent residence status, but only if it goes through the following countertextual process. They apply for and are granted asylum. Then a year later, still being a refugee as required by the adjustment statute, they apply for and are granted permanent residence status. But then, as their own regulations permit, that same day they apply for and would almost nearly have to be granted asylum once more. This procedure does not comport with the government's own regulations and for that reason is not a reasonable construction of its own statute. Well, that's also not the facts of this case. Sure, but if a government interpretation by adjudication... Nor is it the proper legal background of this case, which has to do with the matter of NAI. So why don't you start there? Sure. Matter of NAI misinterprets the statute for asylum termination. The text and structure of that statute first require that this court recognize that... The first principle is that the Attorney General may not deport an asylee. And then the text and structure of the termination grounds are exhaustive. And regardless of the standard of deference that this court employs, whether the court refuses to employ Chevron deference because of the Encino Motor Cars problem that this case presents, or whether this court uses a Step 2 Chevron framework, that list of reasons to remove the anti-deportation protection of asylum are exhaustively enumerated. And this list is twice exhaustive. First, within the structure of this statute, 1158C. Are you asking for us to reconsider our previous decision in this very case, which said that the statute was ambiguous? No, Your Honor. All right. Well, so, you know, aren't we at a question of reasonableness then under Chevron 2? Unless, of course, we dispense with Chevron, which we could do en banc, I suppose. No, Your Honor. In terms of Chevron deference, the board's decision in matter of NAI is not violated the Encino Motor Cars rule. And in Encino Motor Cars, the Supreme Court held that the executive branch is free to change its policies, but in order to do so, it must discharge a minimal three-part... That case, in fairness, involved the same agency overruling its own or changing its own... Correct. This is a different setting, isn't it? Yes, but... The Encino Motor Cars rule is especially important where multiple departments share regulatory authority over the same subject matter. Do you have a case that applies this doctrine to two different departments? No. The Encino Motor Cars was a recent case, so this particular issue has not yet been considered by the court. But the authority that I would point to for why, despite there being two different departments here, that Encino Motor Cars applies is 8 U.S.C. 1103A, which sets out the shared responsibility of the Department of Homeland Security, the Department of State, and the Attorney General in administering and enforcing the immigration laws. I want to go back to a claim you made earlier that this is counter-textual. I take it you agree that the word adjust plays an important role here? Yes. Tell me how the government's reading is counter-textual given that word. Sure. An adjustment is an incremental or minor change. So let's say I say that I want to adjust the temperature in this room from 68 degrees to 72 degrees. Correct. It's not both. It's 72 now. But the fundamental character of the room as being roughly room temperature has not changed. The change is minor. What if I adjust from 60 to 80? That may not be an adjustment. Our reading of the word adjust is that it connotes incremental change. And like the word modify, as Justice Scalia discussed it in the NCI telecoms case, a word-connoting increment cannot change the fundamental nature of the thing. And the fundamental nature of asylum, as said in the asylum statute, is this anti-deportation protection. And so, weighed in tension with the structurally exhaustive... It's a change, right? It's not additive. It's not your X and Y. It's X to Y. Wouldn't you be giving asylees special immunity as LPRs that no other LPR has? And wouldn't that raise an equal protection problem, perhaps? No, Your Honor, because the statute is what gives the special protection. No other immigrant possesses this anti-deportation protection contained in 1158C1. But an asylee only has it while it's relevant, right? Asylum status can be revoked, can it not? Yes, but only for the specifically enumerated reasons listed in 1158C2. And importantly, one of those reasons, important to our expressio unius argument and to our structure of the statute argument, is the acquisition of a new nationality. And if Congress had intended the acquisition of something less than a new nationality, namely permanent resident status, to terminate the protection of the preceding subparagraph, then it would have said so. And so the negative implication of the new nationality termination ground is that other shifts or changes, even if they are shifts or changes in immigration status, are insufficient to terminate this anti-deportation protection. Further, to perhaps address some of Judge Ho's change concern, the statute repeatedly uses the phrase alien-granted asylum. And this court in Seaway v. Holder indicated that that phraseology essentially looks to the historical fact of the asylum grant and not to status as it might be described in other parts of the Immigration and Nationality Act. And in Seaway, this court actually held that an alien whose asylum status had been terminated is still an alien-granted asylum for purposes of then adjusting status. And so the statutory scheme seems to contemplate that in order to deport any alien-granted asylum, then the person has to be put through the specific termination process contemplated in the five termination grounds. Are this circuit and the Fourth Circuit the only two that will have confronted this question? Yes. What about the Second Circuit and Adams? I realize it's a slightly different provision, but it is the same concept, isn't it? It's the case that the Fourth Circuit cites. Right. And I'll be honest, Your Honor, I had not reviewed Adams in my preparation for today. That's all right. And I believe that was because of that. Yeah, that's all right. But my understanding is it's a different part of the INA, but it nevertheless uses the word adjust and it treats the word adjust in the same way that Judge Neumeier did in the Fourth Circuit and it's the same sort of proposal that I'm quoting here. The problem with the Fourth Circuit's reasoning in Mahmoud is that it relies on the board's previous decision in matter of CJH, which this court in this case expressly rejected. But it also has an independent textual analysis. Judge Neumeier goes through the same move about adjust that we just talked about here. Right. Adjust is not adding. It's moving from one state of affairs to a different state of affairs. Right. But both states of affairs do not, none of those states, potentially even multiple states of affairs, change the fact that the only reason to terminate the anti-deportation protection of 8 U.S.C. 1158 C.1 are the expressly listed reasons. It's important also that the sort of 1, 2, 3 matter in which 1158 C. proceeds, one, among other benefits of asylum status, talks about, has the Attorney General may not remove an alien-granted asylum. Two has, however, it may be terminated. And three explicitly says that after termination, an alien-granted asylum may be placed in removal proceedings. And again, I think if this court looks to Seaway, also this phrase, alien-granted asylum, talks also about the historical fact of the asylum grant. I would also want to point out that in addition to the text and structure of the termination statute, that the government's reading departs from its own regulations. The fundamental principle from which this court must proceed, the first principle is that the government's regulations continue to imagine or explicitly contemplate that asylum status and permanent residence status may be concurrently held. Let me ask you a question. Isn't the term adjust used throughout immigration law? In other words, if somebody comes into the country and wants to adjust status from that of a business, you know, a business person to LPR or adjust status to become the wife or husband of a citizen, adjustment is used. I don't recall whether that's precisely in the statute, but that is precisely the term that is used for significant changes, not accretions of status. Yes. An adjustment of status is any application to become a permanent resident. Go ahead. But it's important to recognize that every adjustment of status involves only the removal of conditions from, for a person's presence in the United States. A visitor may not engage in work, may not study, has a time limit. Yeah, but it's a fundamental principle of statutory construction that if the word is used one way in a statute, it means the same thing throughout. That's correct, but our reading of minor change. Well, it's not a minor change if you transform from visitor status to spousal status, right? It's only the removal of conditions. That's not a minor change because, again, like any of these changes, they are the pathway to citizenship, which asylum, I mean, just to take that one, but otherwise these people don't have, whether they're visitor for business, HB1, visitor, student, blah, blah, blah. And in addition to the minor change meaning of the word adjust, I would also just point to the fact that, in fact, asylum is unique. Nowhere else in the immigration laws contains this particular anti-deportation protection. It wouldn't surprise you if somebody asked me, hey, Jim, how are you doing? How are you adjusting from private practice to the bench? Would that be a ridiculous usage? It's a fundamental change. It's not a minor change in terms of my job. But you're still within the fundamentally from in the practice of law. Well, to be rather crude about it, we're on this side of the bench and you're on that side. Yes. Thank you. It's a pretty big adjustment. I'll grant you that it's still within the legal profession. I totally agree with that. But so is true here. In either situation, you are allowed to stay in the United States under the province of the congressional statutes. So it is important, but it is within the same milieu. Yeah. But that possible reading of adjust is hard to reconcile with the apparently exhaustive, with the expressio unius canon as applied to the termination statute, and that this court's task must be to reconcile 1158C with the word adjust. I'll grant you you've got lots of competing textual cues on both sides, and we're doing inferences from various provisions. Ultimately, isn't that why you fail under Chevron? No. Or circuit, and you've got competing textual inferences at best for you. I might argue text is clear against you, but at a minimum, there are inferences against you, aren't there? The answer to that question is no for two reasons. First, the Encino motor car's argument, and sort of the penalty that the Supreme Court has announced for failing to discharge the Encino motor car's duty is that the agency does not get Chevron deference. Second, because our arguments rely on canons of statutory interpretation, this court held in the Department of Labor fiduciary rule case that the canons of statutory interpretation also apply at and can be determinative at Chevron step two. In that case, it was the common law meaning canon. All right, sir. Well, I would like to hear about the, on your rebuttal time, about the question of collateral estoppel.  Okay. Thank you. Thank you. Ms. Black. Good morning, Your Honors. Michelle Slack, on behalf of the respondent, the Attorney General. Slack, I'm sorry. It's all right, Your Honor. I also get flack sometimes. On behalf of the Attorney General, William Barr, this is a case involving expertise in the face of ambiguity. As the court has correctly stated, the prior panel that decided this case has already determined that these statutes are ambiguous and essentially already determined that either interpretation would be reasonable. It sent the case back to the board because it did not believe that the board had considered everything it should have considered. It provided a list of factors it wished the board to consider, and all of those factors were considered by the board. The board reached a permissible interpretation of the statute that the petitioner, Mr. Ali, is no longer an asylee. As no longer an asylee, he is not subject to the termination section 1158C because adjustment is a change in status, not the addition and acquisition of additional statuses. First of all, with regard to the factors that the court asked the board to address, there were basically four. First, the court asked the board to address the interplay between section 1158C, which I'll call the termination statute, and 1159B, which I will call the adjustment statute. The board addressed this interplay, recognizing that even in the termination statute, it says that asylee status is not permanent. It is temporary. In contrast, lawful permanent residency is a permanent status. It puts you on a path to citizenship. It provides you with the ability to travel internationally without advanced parole and a number of other benefits that lawful permanent residents enjoy. It's an upgrade in status in many respects. In addition, the board looked at the term adjustment. It chose to interpret adjustment to mean change. It's looking at the statute, and in the statute itself, it talks about from a status to a different status. You have the status of an alien who has been given asylum, and then you are adjusted to the status of an alien who has been lawfully admitted. In fact, they go back into the records and change your admission from a year back to having been admitted as a lawful permanent resident. Also, throughout the INA, there are several different ways in which someone can adjust status. If this were a particularly different way of interpreting the word adjustment, you'd think that that would actually be something that Congress recognized. But you see nothing in the statute that suggests that adjustment for purposes of adjustment under 1159B is different than the other types of adjustment that are provided in the statute. In addition, the court asked the board to address prior decisions, as well as the DHS regulations, and the board did just that. With regard to the prior decision that this court asked the board to consider, that of matter of VX, the court said that matter of VX is not in conflict of its interpretation of the statute on adjustment status because in VX, the petitioner there had not adjusted to a lawful permanent residency, but remained just simply an asylee, and therefore was subject to the provisions in 1158C, the termination statute. But Mr. Ali is not. He's in a very different position, both procedurally and legally, than the litigant was in VX. The board also looked at the regulations at 8 CFR 208.14G and 8 CFR 1208.14G and found no conflict there. That regulation actually doesn't say that you can have both lawful permanent residency and asylee status at the same time. It simply says that if you have already been granted adjustment of status, we're going to presume that you intend to abandon your application for asylum that was pending at the time. That presumption actually supports a reading that you can't have both statuses at the same time because you would be presumed to not want to downgrade your status from that of a permanent status to that of a temporary status. In very rare instances, some people actually say, no, I want to proceed with my application for asylum because there are a couple of benefits for following relatives that are allowed to take place. There would be a couple of benefits for someone to do that, but it's extremely rare for someone to do that. It seems that that couldn't possibly be what Congress was talking about. The third thing that the court asked the board to consider were the distinctions between refugee and asylees. One of the reasons why the court sent this back to the board to reconsider is they felt there was too much reliance on the board's decision in CJH and then there was too much reliance in CJH on the similarities between refugees and asylees. The board considered the differences in this published opinion in NAI and actually said some of those differences are important. For example, voluntariness of adjustment of status. A refugee actually has to adjust status after a year in the United States under refugee status. An asylee doesn't. An asylee has the choice and does not necessarily ever have to adjust to lawful permanent residency. But in this case, Mr. Ali did. Further, the board said that we weren't relying that much on the similarities between refugees and asylees, but noting the similarities between the particular provisions for adjustment of status. Finally, this court asked the board to consider the legislative history of the laws at issue here. And the board did just that. It examined the legislative history behind the Refugee Act of 1980 and found that Congress intended it to align with and comport with its obligations of the 1967 Protocol. And looking at the handbook that helps to interpret, though is not binding itself, we find that the handbook itself says that it is the participating state, not the United Nations, that determines how to interpret the obligations of any particular signee to the Protocol and that there are actually three ways that someone's asylee status can end. It can end involuntarily by cessation. It can end involuntarily by being revoked for fraud. And it can end voluntarily by someone giving up their asylee status. And the board determined that that's what's happening when you adjust status. You are swapping statuses, one for the other, essentially as an upgrade, like a promotion. If there were particular benefits of the position I currently hold, but I got more money and it was a better title and maybe a nicer office for a promotion, I don't still enjoy necessarily all the same benefits of my current position if I take that promotion. Moving to the issue of collateral estoppel. Wait a minute. You haven't even voiced Encino Motorcars. Oh, Encino Motorcars. Well, as Judge Ho points out, that had to do with the same agency changing its position. We don't have that here. What we have here is that the board is the one that determines how you interpret the immigration laws. Why should that matter? It is a unitary executive, right? Well, Your Honor, the different agencies have their own duties and their own obligations under the statutes. And so as a result— Why should we tolerate unexplained, unjustified inconsistencies just because it's a different reporting channel? Because that's the way the system works. That's the way that Congress designed it. That's the way that the system works, that the board decides how— Do you have any authority for the proposition that Chevron is allowed in that setting but not in the Encino setting? Or is this just an open first impression issue? Well, it wasn't covered in Encino, and I am not aware of any decision that says that Chevron difference is inappropriate when you have— Is it an issue of first impression, or are you saying that the law is squarely on your side? And if so, what's that about? I would say that it appears to be an issue of first impression, but it doesn't apply here. And the reason why it doesn't apply here is, first of all, as I pointed out, none of the regulations say you can have both statuses at the same time. It's simply the DHS interpreted them that way, that you could. But the way that you do that would be you already have lawful permanent residency, and you're applying for asylum for the additional benefits that are available for asylees. But it appears that the new guidance that's out there by DHS is that you can't have both statuses at the same time in light of the board's decision in NAI. So it appears that within the executive, that conflict has now been resolved with DHS essentially recognizing that it's the Board of Immigration Appeals that decides how to interpret the statute. And so that's the reconciliation of that issue there, but it would be an issue of first impression, I believe, Your Honor. Now turning to the question of collateral estoppel. Collateral estoppel is not appropriate in this case because we have a new application for asylum. We have new testimony given to the immigration judge. We had a new immigration judge. We had a new credibility finding, and we had it under a new standard. As this court has recognized in Wang v. Holder, the REAL ID Act substantially changed the standards for determining credibility. Why would a new judge matter? You mentioned that as one of the factors. Well, you have a different fact finder. And so a different fact finder, especially when it comes to credibility, may see credibility differently. You have brand-new testimony and a brand-new immigration judge hearing it. This isn't a forward-looking, based on current circumstances? When he reapplied for asylum, that wasn't based on conditions in Pakistan as they are today? No, that's what I'm saying. It's a new application, and there's new testimony. In fact, one of the grounds of termination, you can actually terminate someone's asylee status because they no longer need it. And you can terminate it if they lied, right? And you can terminate it if they lie. So this was all a new system, and collateral estoppel is not appropriate in that circumstance. And under the REAL-ID Act, this court has recognized in Wang that the immigration judge has more discretion. Well, I'm sort of dubious about that because I was around when the REAL-ID Act came in, and my understanding was that that was meant more to address credibility review made in other circuits where they were overturning immigration judges, and that this circuit had always used the substantial evidence test as opposed to nitpicking credibility choices by the IJs. So I'm not sure that the REAL-ID Act made a fundamental change in this court's approach. That's fair to say, Your Honor, but in reality, the way this system existed pre-REAL-ID Act was very complicated. And somewhat, you know, difficult territory for any immigration judge to wade into, such that when we have in the initial immigration judge's decision of Judge Brown, we don't even have credibility actually addressed or litigated. It's just presumed. There's no discussion of credibility in that one-page decision. And so we don't know what it is that might have been a factor that that judge was considering. Well, to be very, however, the standard for collateral estoppel is a fact that was necessarily determined, and had the IJ not believed Mr. Ali to be credible, he would have been obliged not to grant him asylum. So that's implicit. And we have held for a long time in regular appellate review that a judge doesn't even have to write findings of fact when he issues a judgment, and we have to infer the findings of fact that are necessary to the decision. And that's all we have here. So as a result of it, we don't see anything. Well, that's not all. That's a big thing. But we don't see any evidence it was actually litigated, that there was any issue raised with regard to credibility, that it was ever really addressed, that the immigration judge maybe just didn't feel like whatever inconsistencies there were went to the heart of the matter and then didn't want to move forward with an adverse credibility. We don't know that because we don't see anything except essentially we're going to have a presumption. So we don't see any evidence that it was actually litigated. But this all occurred back in 1992, right? Well, there wasn't all this heart of the matter controversy back in 1992, was there? Well, some of the circuits actually gave it was difficult to determine adverse credibility. As of 1992? I think that's a hypothesis. I'm not sure whether that's the state of the law because what I know about the REAL-ID Act and what precipitated that, but I'm just saying it's a hypothesis. What I do know is that there was a lot of differences of opinion pre-REAL-ID Act, but you might be correct, Your Honor, that in 1992 maybe the heart of the matter wasn't the pivotal concern. There were some unpublished board decisions in the record, and I apologize ahead of time I don't have the record sites for them, but I can provide them to the court after the argument, that were filed with the board that dealt with the board saying something needed to be material in order to support an adverse credibility determination. And that was in the record in this case, and so I say that that's at least something for consideration about the standards pre-REAL-ID Act. Also, the issue about it being necessary for the decision. We're talking about the prior decision was based on past persecution. Past persecution creates a rebuttable presumption of a well-founded fear of future persecution, which because now we're with a brand new application, that brings us right back to the same question. It has to do with what are the circumstances in Pakistan at the time the immigration judge is deciding the new application. Therefore, it's kind of tricky to apply collateral estoppel to just a past persecution determination, and one that is pre-REAL-ID Act. For those reasons, because this was a new application, involved new testimony, a new credibility analysis under a new standard, collateral estoppel is not appropriate. And for those reasons, because first, that the board gave us permissible interpretation that the statute should be read so that once you adjust status, you become a lawful permanent resident and you are no longer an asylee. Therefore, the termination statute in 1158C simply didn't apply to petitioner, and he didn't need to have that status. I have one other little question, and that is I skimmed through the decision of the Fourth Circuit in the Mahmoud case, and I don't think they cited our decision in Alley, right? I don't believe they did. A little strange, isn't it? I mean, it must have been briefed to them. Maybe it wasn't, because it was a year later, so maybe the briefing was underway in the Fourth Circuit. If you would like, Your Honor, I can... No, no, we can look them up online. I just thought that was interesting. Okay. And then finally, as I mentioned about collateral estoppel, it's not appropriate when you have a new application, new testimony, new credibility analysis under a new standard. For those reasons, the respondent asks that you dismiss this petition and affirm the decision of the Board of Immigration Appeals. If there are no further questions, Your Honor? Guess not. Thank you. Thank you. Mr. Jenkins? Quickly, Judge Jones, to reply to your question about Mahmoud. Mahmoud was expressly briefed in light of this Court's decision in Alley, and it was briefly mentioned in the prefatory material, but the actual reasoning in this Court's decision in Alley was not addressed by the Fourth Circuit, and for that reason, Mahmoud is not particularly persuasive here. Turning to the respondent's arguments regarding collateral estoppel, the fact that there was a new application, new testimony, and a new judge in this case is precisely why collateral estoppel should have applied. When collateral estoppel applies, a new trial should not be conducted in the first place. That's the purpose of the document. Suppose I get into a traffic accident five years ago and somebody sued me and I recovered a judgment, and then three years after that I got into another traffic accident and that went to trial. The, quote, credibility in the first trial wouldn't be imputed to me in the second trial, would it? That's correct, because those are different actual facts. Well, why aren't these different? Because the scope of the collateral estoppel that we're asking for relates only to the past persecution analysis. So the past persecution is all the same detention and torture that happened to Mr. Alley in Pakistan in the late 80s and early 90s. Those were fully litigated, and the immigration judge's holding was at the conclusion of the hearing in the presence of counsel for both parties, and after review and consideration of the testimony, importantly, and evidence presented, it is the finding of the court that he has suffered past persecution. And so if this court adopts our collateral estoppel claim, the correct course forward is that the fact of past persecution is what's precluded, and unlike the trial that happened below, the burden of proof is on the government to show one of two particular showings. Either that there has been a fundamental change of circumstances since that past persecution that now defeats the well-founded fear of persecution, or that the government must show that he can internally relocate. That's a fundamentally different legal inquiry than the kind of inquiry that occurred below in this case. The fact that there's a new application, new testimony, new judge, those should not have happened, at least with regard to the issue of past persecution. And so the government's argument seems to boil down to that there's been a change in the law, and as Your Honor intimated in the government's argument, the Montana standard is that there's been a significant change in the legal climate. Well, it's very significant. There's no question about that. But it's not a significant change. Congress, when it enacted the REAL ID Act, said that it was codifying existing evidentiary and credibility standards. Well, I don't know how long you've been doing immigration law, but that is not an accurate statement. That's from the legislative history. My view of the REAL ID Act is that there was this errant Ninth Circuit opinion about that inconsistencies need to go to the heart of the claim, and that the purpose of enacting the credibility-related provisions of the REAL ID Act were to sort of overrule that Ninth Circuit doctrine. The doctrine here in the Fifth Circuit has not significantly changed. And it's the government's burden of proof to demonstrate that this narrow exception to the collateral estoppel applies. I do want to, turning to one of the regulatory arguments that the government made, that the presumed abandonment of an asylum application means that it's a downgrade. I do want to point the court to the supplemental material from those regulations that explicitly say that the ability of the government to grant asylum is, quote, unrelated to a person's current status. And for those reasons, you should grant the petition. Okay. Thank you. Thank you.